IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BUNKERNET LTD. | * | |
|     Plaintiff, | * | Civil Action No. |
| v. | * | **IN ADMIRALTY** |
| GMTC I, LLC, | * | |
|     Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## COMPLAINT

Bunkernet Ltd. ("Bunkernet") complains against GMTC I, LLC ("GMTC I") as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1333 and also pursuant to the diversity jurisdiction of this Court, 28 U.S.C. § 1332 in that this is a suit between a foreign corporation and a Delaware LLC, with an amount in controversy exceeding $75,000 excluding attorneys fees, interest and costs. This action is an admiralty and maritime complaint within the meaning of Fed. R. Civ. P. 9(h).

2. Venue is proper in this Court because GMTC I is a Delaware limited liability corporation.

## THE PARTIES

3. Bunkernet is a Cyprus corporation which sells marine fuel and lubricants for use aboard ocean-going vessels (collectively herein, "bunkers").

4. GMTC I is a Delaware LLC which lends money to shipowners including through the use of mortgages and as a part of that business arranges for the sale of ocean-going vessels,

including the Scrap Vessels (as defined below), to which Bunkernet provided bunkers, as set out herein.

## GMTC I'S FAILURE TO PAY FOR THE BUNKERS

5. GMTC I held successive mortgages on the ocean going motor tanker vessels PALENQUE 1, HUASCAR and SEA PIONEER (herein collectively, the "Vessels").

6. The ultimate mortgagor for each of the GMTC I mortgages over the Vessels was Trinity Ships Inc. ("Trinity"), owned and controlled by John Harbis and the Harbis family, which was the ultimate owner of Tilman Enterprises Inc. ("Tilman," owner of the PALENQUE 1), Bondi Shipholding SA ("Bondi," owner of the motor tanker SEA PIONEER) and Nodol Trading SA. ("Nodol," owner of the HUASCAR).

7. On or about 9 November, 2017, Tilman, Bondi and Nodol entered into a secured loan agreement with GMTC I whereby GMTC I would loan Tilman, Bondi and Nodol $12,500,000 in exchange for fleet mortgages against the motor tankers PALENQUE 1, SEA PIONEER and HUASCAR, jointly and severally, thus improving its securities and repayment demands vis-à-vis the previous loan agreement(s).

8. The way that Trinity (and Tilman, Bondi and Nodol) would fund the secured loan agreement with GMTC I, was that the PALENQUE 1 and the HUASCAR (herein collectively, the "Scrap Vessels") were to be sold and Trinity, through Bondi, would continue to operate the SEA PIONEER. Trinity (and Tilman, Bondi and Nodol) agreed with GMTC I that the PALENQUE 1 and HUASCAR would be sold for scrapping at Alang, India. Once the Scrap Vessels were sold for scrap, there would be funding to repay much of the secured loan with GMTC I. Trinity (and Bondi) then would repay the balance from the operation of the SEA PIONEER. GMTC I also had extra security through a personal guarantee from the owners of

Trinity, John Harbis who provided GMTC I with a personal guarantee and also assigned to GMTC I all the insurances of the Vessels, which included an already incurred insurance claim of a substantial sum.

9. Amidst the above arrangements, as is natural, each of the three Vessels required bunkers and lubricants , to be able to continue to operate, and for the Scrap Vessels to carry out their voyages to India for scrapping. Trinity contacted Bunkernet to buy the necessary bunkers and lubricants. Given that the Scrap Vessels were to be sold, Bunkernet made clear to Trinity that as a condition of providing bunkers and lubricants to the Vessels on credit, it required further security.

10. Bunkernet does not provide bunkers or lubricants on credit to vessels bound for scrapping, without further guarantees of payment. This is because scrapping extinguishes the option to arrest the vessels upon non-payment and the further security of a maritime lien *in rem* against the vessels is also extinguished. Bunkernet only provided the bunkers and lubricants to the Vessels because of GMTC I's promise, which John Harbis, principal of Trinity, related to Bunkernet, namely that GMTC I would fully pay Bunkernet from the proceeds of the sale for scrapping of the PALENQUE I and HUASCAR (i.e. the Scrap Vessels).

11. John Harbis and his related companies, including Trinity, had a long course of dealing with Bunkernet including the performance by John Harbis and Trinity of payment plans with Bunkernet. John Harbis assured Bunkernet that GMTC I had authorized him to confirm to Bunkernet that GMTC I would fully pay Bunkernet from the sale proceeds for scrap of the PALENQUE I and HUASCAR.

12. Trinity, through its principal, John Harbis, expressed to GMTC I Bunkernet's need for further security. GMTC I authorized Trinity, through its principal, John Harbis, to

confirm to Bunkernet that once the PALENQUE 1 and HUASCAR arrived at Alang and were sold, GMTC I would pay Bunkernet the amount of any unpaid bunkers and lubricants, from the proceeds of the sale of the Scrap Vessels and according to Bunkernet's sales terms and conditions. GMTC I fully authorized John Harbis for Trinity to make these representations on behalf of GMTC I.

13. Consequently, based on this promise which GMTC I authorized John Harbis and Trinity to make to Bunkernet, Bunkernet, in reliance on this promise, agreed to provide bunkers and lubricants to each of the Vessels, further according to Bunkernet's sales terms and conditions and invoices respectively to Trinity, Tilman, Bondi and Nodol.

14. Thereafter, Bunkernet provided the respective Vessels with bunkers and lubricants including the following:

> **PALENQUE 1**: Bunkers on 15 November at Lome, Togo, invoice value of USD 262,486.06; Lubricants on 16 November, 2017 at Lome, Togo, at an invoice value of USD 65,300;
>
> **HUASCAR**: Bunkers at Lome, Togo on 18th December, 2017 at an invoice value of USD 185,117.28; Lubricants at Lome, Togo 17th November, 2017 at an invoice value at USD 58,160.
>
> **SEA PIONEER**: Bunkers at Amsterdam, Netherlands on 7th December, 2017 at an invoice value of USD 45,333.92; Bunkers at Portland, UK on 4th December, 2017 at an invoice value of USD 56,545.30

15. Consequently, on the promise of GMTC I through John Harbis, Bunkernet in November and December, 2017 provided a total of $571,063 worth of bunkers and lubricants to the PALENQUE 1 and the HUASCAR at Lome, Togo. No further bunkers were loaded aboard those vessels before their respective arrests at Namibia, described below.

16. Bunkernet's sales terms and conditions, through which Bunkernet provided the bunkers and lubricants to each of the Vessels, provided for Bunkernet to continue to hold title to the bunkers and lubricants until Bunkernet was fully paid for them, as follows:

> 1.3 "Marine Fuel" means the different grades of Bunker Fuel Oil, Intermediate Bunker Fuels, Marine Fuel Oil, Thin Fuel Oil, Marine Diesel Oil, Light Marine Diesel Fuel and Gas Oil or any other type and grade of oil and lube oil delivered or contracted to be delivered or arranged to be delivered by the Seller.
>
> \* \* \*
>
> 14.1 Title to the Marine Fuel shall remain with the Seller and pass to the Buyer only upon payment of the Purchase Price of the Marine Fuel delivered and all other monies, pursuant to Clause 10 hereof. Until such time as payment is made, on behalf of itself and the Vessel, the Buyer agrees that it is in possession of the Marine Fuel as a mere bailee of the Seller. If, prior to payment, the Seller's Marine Fuel is co-mingled with other marine fuels on board the Vessel, title to the Marine Fuel shall remain with the Seller at the quantity corresponding to that of the Marine Fuel delivered. If the Buyer co-mingles the Marine Fuel with other marine fuels owned by a third party and the total co-mingled fuels are reduced through use to an amount less than the amount delivered under the Contract, title in the unused fuels will remain with the Seller on a pro rata basis calculated using the quantities as they were when originally co-mingled.

17. On January 10, 2018 GMTC I issued a notice of default to the mortgagors of the Vessels.

18. The HUASCAR experienced engine damages in mid-ocean, off Gabon.  Instead of having that Vessel sail to the nearest port, GMTI I instead directed the HUASCAR  to Walvis Bay,  Namibia, which was about 1500 nautical miles away from HUASCAR's initial position off of Gabon, requiring at least 6 days at sea if this Vessel was able to maintain a speed of 10 knots (the sailing time longer, with engine damage and thus slower speed).   Walvis Bay, Namibia was not the nearest port to the HUASCAR nor was it the one where stores and repair services were most easily available.  GMTC I thus ordered the HUASCAR to Namibia so that it could arrest there in foreclosure of GMTC I's mortgage.  The HUASCAR was arrested on or about January

16, 2018 upon its arrival at Walvis Bay, Namibia.  GMTC I conveniently intervened in that arrest and asserted its allegedly superior mortgage position over other claimants.

      19.      The PALENQUE 1 was well on the way to India and had passed Namibia and the Cape of Good Hope when GMTC I also ordered this Vessel to turn around and sail to Namibia, to be arrested like the HUASCAR.  The Cape of Good Hope is about 775 nautical miles from Walvis Bay; sailing from the Cape of Good Hope to Walvis Bay requires over 3 days' sailing with the vessel making a steady 10 knots.  Although GMTC I attempted to justify ordering the Vessel to  backtrack  to Walvis Bay claiming that the PALENQUE 1 had run out of fresh water, the South African port of Cape Town and others in the vicinity  where fresh water was readily available, were much nearer to this Vessel than Walvis Bay.  GMTC I thus also deliberately ordered the PALENQUE 1 to Namibia so that it could arrest there in foreclosure of its mortgage.  The PALENQUE 1  was arrested at Walvis Bay on February 23, 2018 (more than a month after the HUASCAR'S arrest), shortly after its arrival, with GMTC I also conveniently intervening in that arrest and asserting its allegedly superior mortgage position over other claimants, including Bunkernet.

      20.      GMTC I as set out above directed both the PALENQUE 1 and HUASCAR to sail to Namibia, where GMTC I arrested them in foreclosure on its mortgage over each.  Controlling each of the Scrap Vessels, GMTC I sold each by way of a private "treaty" sale conducted through the Namibia court.  GMTC I received payment for the Vessels, but failed and refused to pay Bunkernet for the bunkers and lubricants that Bunkernet had provided to the Scrap Vessels.  The  SEA PIONEER was arrested in the Netherlands and GMTC I also has asserted its claims in the Netherlands proceedings, however, Bunkernet has not been paid for the bunkers and lubricants it provided to the SEA PIONEER, either.

21.     GMTC I's total payment demands over each of the three Vessels' arrests, in Namibia, and the Netherlands, totaled over $14,000,000, although the principal sum that GMTC I actually was owed was at most nearly $5,000,000 less (approximately $9,500,000).  With this excessive, $14,000,000 demand, and the Harbis guarantee and insurance proceeds assignment (described above),  GMTC I claimed well more than it ever could have been entitled to receive through its mortgages of the Vessels.

22.     At the time of the arrest of the PALENQUE 1, some of the bunkers which Bunkernet had loaded at Lome, Togo remained aboard that Vessel.  The Namibia court set aside the value of those bunkers in respect of the PALENQUE 1 in a fund separate from that Vessel's sale proceeds, in recognition that the remaining bunkers belonged to Bunkernet through Bunkernet's title retention terms, set out above.  Bunkernet received $159,400.70 from this bunker fund, leaving the balance of the bunkers loaded at Lome on the PALENQUE 1, to which Bunkernet had continued to retain title, not paid for.  Bunkernet received no payment for the lubricants loaded aboard both the HUASCAR and the PALENQUE 1, and for the bunkers loaded aboard the HUASCAR, although retaining title to those lubricants and bunkers as set out above.

23.     Consequently, after payment of the said bunker fund amount, for provision of bunkers and lubricants to the Vessels which was never paid to Bunkernet, Bunkernet is owed including contractual interest and legal fees a total of $863,714, with contractual interest and legal fees continuing to accrue.

## COUNT I – Breach of Contract

24.     Bunkernet repeats the foregoing paragraphs.

25.     GMTC I through Trinity as set out above contracted with Bunkernet to provide the bunkers and lubricants to the Vessels.

- 8 -

26. GMTC I despite repeated demands has not paid Bunkernet for the bunkers and lubricants and has breached its contract with Bunkernet.

27. GMTC I owes Bunkernet damages as demanded below.

## COUNT II – Unjust Enrichment

28. Bunkernet repeats the foregoing paragraphs.

29. GMTC I received payment for the sale proceeds of the PALENQUE 1 and the HUASCAR, and has received and will receive further payment for the sale proceeds of the SEA PIONEER, in repayment of its mortgages over each Vessel, having been able to achieve this because Bunkernet provided bunkers and lubricants to each Vessel.  GMTC I never paid Bunkernet for the bunkers and lubricants which enabled that payment and repayment.  GMTC I also has claimed excessive amounts through its mortgages over the Vessels and the proceedings to enforce those mortgages against the Vessels.

30. GMTC I therefore has been unjustly enriched in at least the amount of the bunkers and lubricants which Bunkernet provided to each of the Vessels, as demanded below.

## Count III - Conversion

31. Bunkernet repeats the foregoing paragraphs.

32. Title to the bunkers and lubricants which Bunkernet provided to the Vessels, remained with Bunkernet, and, that title continued over the bunkers and lubricants which remained aboard the Scrap Vessels after their bunkering at Lome, Togo and their direction by GMTC I to Namibia.

33. GMTC I used and converted a principal amount of $411,662.30 ($571,063 less $159,400.70 paid from the PALENQUE 1 bunker fund from the sale in Namibia) of the bunkers

and lubricants loaded at Lome, to which Bunkernet had continued to retain title.  Bunkernet was never paid for these bunkers and lubricants.

34. GMTC I therefore owes Bunkernet damages for its conversion of Bunkernet's bunkers and lubricants, as demanded below.

WHEREFORE, Bunkernet demands judgment against GMTC I as follows:

A. In response to Counts I and II (Breach of Contract and Unjust Enrichment), damages of at least $863,714.91, plus prejudgment interest, costs and attorneys' fees;

B. In addition for Count I, contractual attorneys' fees and interest;

C. In response to Count III (Conversion), damages of at least $411,662.30, plus prejudgment interest and costs; and

D. For other and further proper relief.

          YOUNG CONAWAY STARGATT & TAYLOR LLP

          /s/ Timothy Jay Houseal
          Timothy Jay Houseal (Del. Bar ID 2880)
          Rodney Square
          1000 North King Street
          Wilmington, DE 19801
          (302) 571-6682
          thouseal@ycst.com
          *Attorneys for Bunkernet Ltd.*

Dated:  November 15, 2019

OF COUNSEL:
J. Stephen Simms
Simms Showers LLP
201 International Circle
Baltimore, Maryland 21030
(410) 783-5795
jssimms@simmsshowers.com